OPINION
{¶ 1} Defendant-appellant, Jerry L. Stewart, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas. For the following reasons, we affirm that judgment.
 {¶ 2} On March 3, 2006, a Franklin County Grand Jury indicted appellant with 12 counts of gross sexual imposition in violation of R.C. 2907.05 and seven counts of rape in violation of R.C. 2907.03. The charges arose from allegations made by A.M., the daughter of appellant's wife. A.M. alleged that appellant sexually abused her in 2004 and 2005. During that time frame, A.M. was between 14 and 15 years old. Appellant entered a not guilty plea to the charges and proceeded to a jury trial. *Page 2 
 {¶ 3} At trial, Theresa Stewart testified that she moved in with appellant in 2000. Shortly thereafter, two of her three kids also moved in with her and appellant. Theresa's third child, A.M., did not move in with them until June 2004. A.M. had previously lived with her father. A.M. testified that she initially liked appellant and that he made her mother happy.
 {¶ 4} However, A.M. testified that within two months of moving in with appellant and her mother, appellant started to enter her room at night to see if she was awake. Appellant would place his hand on her back and touch her in other places, like her breasts and her vagina. A.M. pretended to be asleep when he did this. She described other touching incidents that occurred in other places in the house, such as a time when she fell asleep on the couch and appellant woke her by moving her hand to touch his penis. She also testified that he forced her to have sex with him two or three times. A.M. did not tell anyone about these acts. She stated that she did not think that her mother would believe her and she did not want to break up the family.
 {¶ 5} Appellant and Theresa were married in March 2005. A.M. thought the marriage would stop appellant's abuse. However, she testified that shortly before school ended for the year in early June 2005, appellant again touched her in a sexual manner. That day, she ran away from home. She returned home later that night and for the first time told her mother that she thought appellant had touched her inappropriately. When asked why she thought this, A.M. told her mother that she thought appellant had been in her room at night and went through one of her drawers. When Theresa asked for more details, A.M. changed the topic and would not divulge any more information.
 {¶ 6} Theresa testified that the previous evening she, appellant, and A.M. had an argument over A.M.'s large cell phone bill. Appellant and Theresa had previously warned *Page 3 
A.M. that she would lose her cell phone if she ran up such large bills. Appellant also told Theresa about some damage that A.M. had caused to the family car a month earlier. After hearing an explanation from A.M. that Theresa felt was not believable, Theresa told A.M. that she would have to tell her the truth about the car by the time Theresa got home from work the next day. The following day was the day that A.M. ran away and then expressed concern about appellant allegedly touching her inappropriately.
 {¶ 7} Despite A.M.'s allegations, she continued to live with her mother and appellant at their house. However, on June 21, 2005, Theresa found a journal A.M. kept in which A.M. disclosed suicidal thoughts. A.M. implied in the journal that she had been sexually abused by appellant, but she did not identify any specific instances of abuse. That same day, appellant also noticed red marks on A.M.'s forearm and a steak knife missing from the kitchen. Appellant and Theresa were concerned for A.M.'s safety, so they took her to the Ohio State University Medical Center. She was admitted to OSU's Harding Behavioral Health facility. She remained in the facility for one month. During her stay there, she told counselors that appellant had sexually abused her.
 {¶ 8} On July 11, 2005, A.M. was interviewed by Sha Clark at the Childrens' Hospital Center for Family and Child Advocacy. During that interview, A.M. described repeated acts of abuse by appellant. She alleged that he touched her breasts, buttock, and vagina. She also described digital and penile penetration of her vagina, as well as acts of oral sex. A.M. had not previously disclosed much of this information. A.M. also reported instances when appellant ejaculated in her bedroom. Clark testified that A.M. told her the abuse began shortly after she moved in with appellant and her mother and that the last act of abuse occurred on June 7, 2005. *Page 4 
 {¶ 9} As a result of these allegations, the Columbus Police Department executed a search warrant of appellant's house to search for physical evidence of the abuse. They collected two mattresses and two comforters from A.M.'s room and examined those items for bodily fluid. Dr. Raman Tejwani, a Forensic Biologist with the Columbus Police Crime Lab, testified that a semen stain was found on one of the mattresses. Further testing revealed that DNA obtained from the epithelial, or female, fraction of the semen stain matched A.M.'s DNA, and that DNA obtained from the male fraction of the semen stain matched appellant's DNA. Dr. Tejwani could not tell when the semen was deposited on the mattress.
 {¶ 10} C.W., one of Theresa's other children, testified that she and A.M. shared a bunk bed. She slept on the top bunk and A.M. slept on the bottom bunk. C.W. testified that she was a light sleeper, and that the bunk bed would shake if anyone laid down on the bottom bunk. She also stated that the bed creaked loudly if they moved around in the bed. C.W. never saw or heard appellant in the bedroom with A.M. C.W. also testified that A.M. once told her that A.M. wanted to break up her mother's relationship with appellant so that A.M. could go back and live with her biological father. C.W. stated that A.M. told her that she could accomplish this by telling lies.
 {¶ 11} Theresa also testified that their house was an older home which had creaky floors and that she would have known if appellant had left their room in the middle of the night and gone into A.M.'s bedroom. Theresa stated that she did not believe her daughter's allegations.
 {¶ 12} Appellant also denied he ever touched A.M. in a sexual or inappropriate manner. *Page 5 
 {¶ 13} The jury found appellant guilty of three counts of gross sexual imposition: Count 1, which alleged that appellant had sexual contact with A.M. sometime between July 4, 2004 and August 31, 2004; Count 15, which alleged that appellant had sexual contact with A.M. sometime between September 1, 2004 and March 26, 2005; and Count 18, which alleged that appellant had sexual contact with A.M. sometime between June 1, 2005 and June 30, 2005. The jury found appellant not guilty of the remaining 15 counts.[1] The trial court sentenced appellant accordingly.
 {¶ 14} Appellant appeals and assigns the following errors:
 [1]. The trial court violated Appellant's rights to due process and a fair trial when it entered judgments of conviction for three counts of gross sexual imposition in violation of R.C. 2907.05.
 [2]. The trial court erred when it permitted the State to introduce State's Exhibit 4, an unfairly prejudicial photograph of Appellant, in contravention of Evid. R. 403(A). This error deprived Mr. Stewart of his right to a fair trial, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, and Section 16, Article I of the Ohio Constitution.
 {¶ 15} Appellant contends in his first assignment of error that his convictions were against the manifest weight of the evidence. We disagree.
 {¶ 16} The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. State v. Brindley, Franklin App. No. 01AP-926, 2002-Ohio-2425, at ¶ 16. When presented with a challenge to the manifest weight of the evidence, an appellate court, after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of *Page 6 
fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Id.
 {¶ 17} A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial.State v. Raver, 10th Dist. No. 02AP-604, 2003-Ohio-958, at ¶ 21. The trier of fact is free to believe or disbelieve all or any of the testimony. State v. Jackson (Mar. 19, 2002), 10th Dist. No. 01AP-973;State v. Sheppard (Oct. 12, 2001), Hamilton App. No. C-000553. The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. State v. Williams, 10th Dist. No. 02AP-35, 2002-Ohio-4503, at ¶ 58; State v. Clarke (Sept. 25, 2001), 10th Dist. No. 01AP-194. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the fact finder's determination of the witnesses' credibility. State v.Covington, 10th Dist. No. 02AP-245, 2002-Ohio-7037, at ¶ 28; State v.Hairston, 10th Dist. No. 01 AP-1393, 2002-Ohio-4491, at ¶ 74.
 {¶ 18} In order to convict appellant of gross sexual imposition, the state must prove beyond a reasonable doubt that the defendant had sexual contact with A.M. R.C. 2907.05(A). "Sexual contact" is defined as "touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." *Page 7 
R.C. 2907.01(B). The trier of fact may infer a purpose of sexual arousal or gratification from the type, nature, and circumstances of the contact, along with the personality of the defendant. State v. West, 10th Dist. No. 06AP-11, 2006-Ohio-6259, at ¶ 17; In re A.L., 12th Dist. No. CA2005-12-520, 2006-Ohio-4329, at ¶ 20.
 {¶ 19} A.M. described three specific instances of sexual touching that seem to correlate to the jury's guilty verdicts. First, A.M. testified that she moved back in with her mother in June 2004 and that appellant first touched her in a sexual manner within two months thereafter. This is within the time frame alleged in count 1 of appellant's indictment. A.M. alleged that the first time appellant touched her, she had fallen asleep on the couch with appellant. She woke up when appellant moved her hand toward his penis. A.M. stated that appellant made her touch his penis with her hand. Second, A.M. testified that appellant touched her breasts underneath her shirt while the family was staying at a hotel on a vacation. She believed that this incident was the second time appellant touched her in a sexual manner. This incident occurred at the beginning of the time frame alleged in Count 15 of the indictment. Finally, Sha Clark testified that A.M. told her the last sexual touching incident occurred on June 7, 2005. A.M. testified that sometime shortly before school ended for the year in early June 2005, appellant again touched her in a sexual manner. This touching occurred between June 1, 2005 and June 30, 2005, the time frame alleged in Count 18.
 {¶ 20} Appellant argues that these convictions are against the manifest weight of the evidence because A.M.'s testimony was not credible. Appellant notes that A.M. made her initial, vague allegation of sexual abuse shortly after their argument over A.M.'s cell phone bill and the damage to the family car. For weeks after the initial allegation, A.M. lived in the same house with appellant and did not change her behavior or make any *Page 8 
further allegations. A.M. made more specific allegations only after she was admitted to the OSU Harding facility. Only then did she disclose many more instances of sexual contact, including digital and penile penetration. Appellant argues that because A.M. did not get what she wanted with her first vague allegation (i.e., to break up her mother's relationship with appellant), A.M. fabricated more specific and serious allegations.
 {¶ 21} Appellant also argues that A.M.'s allegations that appellant repeatedly came into her room at night to molest her are not credible given C.W.'s testimony that C.W. never heard appellant enter the room or get in A.M.'s bed. Nor did Theresa ever wake up when appellant allegedly got out of bed to go to A.M.'s room. Moreover, appellant argues that A.M.'s allegations are not credible because between January and March 2005, two months of the time frame alleged in Count 15, he was in a leg brace and used crutches to get around because of a knee injury. Appellant also notes that when asked to draw a picture of a penis at trial, A.M. drew a circumcised penis. A.M. later described appellant's penis as a regular penis like the one that she drew. However, Theresa testified that appellant's penis was not circumcised. Finally, appellant argues that A.M.'s lack of credibility is demonstrated by the fact that the jury acquitted him of 15 of the 18 counts pending against him.
 {¶ 22} With the exception of the DNA evidence, the state's case was largely premised on A.M.'s testimony. Appellant's defense focused on attacking A.M.'s credibility and providing an alternative explanation for why a stain from appellant's semen was found on A.M.'s mattress. A conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony. State v.Houston, 10th Dist. No. 04AP-875, 2005-Ohio-4249, at ¶ 38, overruled on other grounds, In re Ohio Criminal Sentencing Statutes Cases,109 Ohio St.3d 313, 2006-Ohio-2109. The jury heard all of *Page 9 
the evidence and chose to believe some of A.M.'s allegations over appellant's denials. This was within the province of the jury. State v.Lee, 10th Dist. No. 06AP-226, 2006-Ohio-5951, at ¶ 14. The determination of weight and credibility of the evidence is for the trier of fact.State v. DeHass (1967), 10 Ohio St.2d 230. The jury was free to believe or disbelieve appellant's testimony. State v. Jackson (Mar. 19, 2002), 10th Dist. No. 01AP-973. We cannot say that the jury clearly lost its way and created a manifest miscarriage of justice.
 {¶ 23} Appellant's convictions are also not against the manifest weight of the evidence simply because the jury acquitted appellant of the majority of the charges against him. The jury is free to believe or disbelieve any or all of a witness' testimony. State v. Hudson, 10th Dist. No. 06AP-335, 2007-Ohio-3227, at ¶ 18, citing Jackson. Here, it was within the province of the jury to believe some of A.M.'s testimony but disbelieve other portions of her testimony. The jury obviously believed her testimony that appellant engaged in three acts of sexual contact but disbelieved her allegations of other abuse, including rape. This is within the province of the jury and we cannot say the jury clearly lost its way in making this determination.
 {¶ 24} None of appellant's arguments render A.M.'s testimony inherently unreliable and not worthy of belief. State v. Jackson, 10th Dist. No. 06AP-1267, 2008-Ohio-1277, at ¶ 16. The fact that A.M. first made a vague allegation of sexual abuse and only later alleged more specific acts of abuse does not render her testimony unreliable. One of A.M.'s counselors at OSU Harding, Julie Calestro-McDonald, testified that it is common for a child to gradually disclose the details of abuse as the child begins to feel more comfortable and safe in their environment. Calestro-McDonald also testified that because the events are sometimes so horrific, a child may have difficulty remembering the *Page 10 
specifics of the sexual abuse until the child is psychologically ready. Oftentimes, the child is nervous about disclosing abuse, so they disclose a little and wait to see how it is received. If they are made to feel safe, they will disclose more. Therefore, the fact that A.M. only gradually disclosed the sexual abuse does not render her testimony unworthy of belief.
 {¶ 25} Nor does the fact that A.M. continued to live with appellant and her mother after her initial disclosure of abuse without demonstrating any change in behavior render her testimony completely unbelievable. Although A.M.'s outward attitude or behavior may not have changed, her journal entries during this time period reflect that she was a troubled girl who was very concerned about the ramifications of her sexual abuse allegations, particularly on her mother.[2]
Therefore, the jury may have believed that A.M. acted "normal" during this time period to avoid upsetting her mother.
 {¶ 26} Although appellant challenges A.M.'s credibility based on her statement that appellant's penis looks like the penis she drew (which appeared to depict a circumcised penis), when he is uncircumcised, we do not find that this point weighs heavily against appellant's convictions. Appellant was convicted of three counts of gross sexual imposition, of which only one involved A.M. touching his penis. A.M. testified that she did not fully open her eyes during this act. The jury could have believed that given the trauma associated with the abuse, A.M. was simply mistaken or that her drawing was not detailed enough to show the difference between a circumcised and uncircumcised penis. We also note that A.M. was not asked if appellant had been circumcised or if she knew the difference between a circumcised and uncircumcised penis. *Page 11 
 {¶ 27} The fact that Theresa did not hear appellant getting out of bed in the middle of the night, or that C.W. did not hear or see any abuse while sleeping in the top bunk above A.M. does not demonstrate that appellant's convictions are against the manifest weight of the evidence. Of the three convictions, only one involved an act that occurred in A.M.'s bedroom. A.M. testified that that incident occurred in the morning, and there was no evidence that C.W. was in the room. The other convictions involved sexual touching that occurred in appellant's living room and in a hotel room. A.M. testified that the touching in the living room occurred after she and appellant fell asleep together on a couch. Obviously, appellant would not have gotten out of bed in that instance. With respect to the incident in the hotel room, A.M. testified that her mother did wake up when appellant touched her in the hotel room, but that appellant lied and said he was checking on A.M. because he heard her breathing hard.
 {¶ 28} We also reject appellant's argument that he could not have abused A.M. because he wore a leg brace and used crutches for two months in early 2005, part of the time frame alleged in Count 15. The record reflects that the incident referred to in Count 15 occurred in the fall of 2004, months before appellant used the leg brace and crutches.
 {¶ 29} Finally, the jury could have disbelieved C.W.'s testimony that A.M. told her she would lie to end her mother's relationship with appellant. A.M. denied making such a statement. Although A.M. allegedly made this statement to C.W. before A.M. disclosed the abuse, C.W. did not tell anyone about A.M.'s statement until March 2006, a month after C.W. learned of A.M.'s allegations. When asked why she waited so long to disclose this information, C.W. said she waited until A.M. was out of the house so that A.M. could not do anything. However, A.M. left the house in June 2005 and never returned. Therefore, there was a reasonable basis for the jury to disbelieve C.W.'s testimony. *Page 12 
 {¶ 30} Given the conflicting testimony, this is not the exceptional case where the evidence weighs heavily against the convictions. Accordingly, appellant's convictions are not against the manifest weight of the evidence, and we overrule his first assignment of error.
 {¶ 31} Appellant contends in his second assignment of error that the trial court erred when it admitted an unfairly prejudicial picture in violation of Evid. R. 403(A). The picture is from appellant's wedding day. The picture shows a number of family members, including appellant, Theresa, and her three children. Appellant is standing next to A.M., who is wearing a sleeveless dress with a v-neck. Where appellant is looking in the picture is subject to different intrepretations.
 {¶ 32} The trial court originally declined to admit the picture, finding that although the picture was relevant, Evid. R. 403 required the exclusion of the picture. However, the trial court admitted the picture after Theresa testified. In her direct examination, Theresa testified that it was not possible that appellant could be sexually attracted to A.M. To impeach her, the state asked her if appellant was looking at A.M.'s breasts in the picture. She replied that it did not appear that way. The trial court then admitted the picture, reasoning that Theresa's testimony eliminated the prejudicial effect of the picture because she expressed her opinion that the picture does not show appellant looking at A.M.'s breasts.
 {¶ 33} Appellant claims that the picture was unfairly prejudicial because it unfairly suggests that appellant was looking down A.M.'s dress. He claims that the unfair prejudice substantially outweighs the picture's probative value because the picture has no probative value. Although appellant couches his argument in terms of the unfair prejudice of the picture substantially outweighing the picture's probative value, appellant's argument *Page 13 
really challenges the picture's relevance, because he contends the picture has no probative value.
 {¶ 34} To be relevant, evidence must have a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid. R. 401. Here, one reasonable interpretation of the picture is that it shows appellant looking down A.M.'s dress. Other reasonable interpretations of the picture are that appellant was simply looking down toward the ground or at nothing at all the moment the picture was taken.
 {¶ 35} The fact that the picture can be reasonably interpreted in multiple ways does not mean the picture lacks relevance, and is therefore, inadmissible. State v. Hunt, 10th Dist. No. 06AP-1155,2007-Ohio-3281, at ¶ 9-10; see also State v. Sims, 12th Dist. No. CA2007-11-300, 2009-Ohio-550, at ¶ 25.
 {¶ 36} In Hunt, this court affirmed the admission of a letter in a trial for domestic violence in which the defendant apologized for hurting the victim. The defendant argued that it was not clear in the letter that he was apologizing for physically hurting the victim. Although we agreed that the letter could be open to different interpretations, we nonetheless found the letter admissible. Id. at ¶ 9-10. We decided that the jury could construe the letter as it wished, and that if it interpreted the letter to be an admission of physically harming the victim, then the letter would clearly be relevant and probative. Id., at ¶ 10. ("[I]t is the function of the jury to weigh competing inferences and accept the ones it finds most reasonable.").
 {¶ 37} In the instant case, because the jury could reasonably interpret the picture as showing appellant looking down A.M.'s dress, the picture would tend to prove that appellant was sexually interested in A.M. and would, therefore, lend credibility to A.M.'s *Page 14 
allegations. Id. Thus, the picture was relevant evidence. Although the probative value of the picture may not have been great, the trial court did not abuse its discretion in finding it relevant.
 {¶ 38} However, just because evidence is relevant does not necessarily mean the evidence is admissible. Evid. R. 403(A) states, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." In a sense, any evidence presented by a prosecutor in pursuit of a conviction could be viewed as prejudicial. Evid. R. 403 prohibits the admission of relevant evidence only if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. State v. Skatzes, 104 Ohio St.3d 195,2004-Ohio-6391, at ¶ 107, citing State v. Wright (1990),48 Ohio St.3d 5, 8.
 {¶ 39} If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Evid. R. 403. Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Oberlin v. Akron Gen. Med. Ctr. (2001),91 Ohio St.3d 169, 172, quoting Weissenberger's Ohio Evidence (2000) 85-87, Section 403.3; see also State v. Broadnax (Feb. 16, 2001), 2nd Dist. No. 18169, citing State v. Geasley (1993), 85 Ohio App.3d 360. Unfavorable evidence is not the equivalent of unfairly prejudicial evidence.Geasley, at 373. Evidence that arouses emotions, evokes a sense of horror, or appeals to an instinct to punish may be unfairly prejudicial.State v. Cooper (2002), 147 Ohio App.3d 116, at ¶ 57; Oberlin (unfairly prejudicial evidence appeals to emotions rather than intellect).
 {¶ 40} The admission or exclusion of relevant evidence pursuant to Evid. R. 403(A) is within the sound discretion of the trial court. Id. Therefore, an appellate court should *Page 15 
not interfere absent an abuse of that discretion. State v. Hymore
(1967), 9 Ohio St.2d 122. "An abuse of discretion `connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" State v. Jackson,107 Ohio St.3d 53, 2005-Ohio-5981, at ¶ 181, quoting State v. Adams (1980),62 Ohio St.2d 151, at 157.
 {¶ 41} Because the picture at issue here was relevant, it was incumbent on appellant to demonstrate that its probative value was substantially outweighed by the danger of unfair prejudice. Appellant did not meet this burden. In fact, appellant failed to articulate exactly how the picture's probative value was substantially outweighed by the danger of unfair prejudice. There is nothing in the picture that unfairly appeals to a juror's emotions or evokes a sense of horror or outrage. Appellant's argument that the admission of the picture was unfair because it does not show appellant looking down A.M.'s dress does not demonstrate unfair prejudice. That argument addresses the picture's relevance (i.e., its probative value). As we previously noted, because one reasonable interpretation of the picture is that it shows appellant looking down A.M.'s dress, the picture was relevant evidence.
 {¶ 42} In addition, the state used the picture to impeach Theresa's testimony that appellant could not have been sexually attracted to or interested in A.M. When asked whether appellant was looking at A.M.'s breasts in the picture, Theresa said no. Thus, the danger of unfair prejudice was reduced because the jury understood that the picture was subject to different interpretations. See Sims, at ¶ 25 (probative value of letter open to different interpretations not outweighed by unfair prejudice, especially since defendant testified to his own interpretation of contents of letter). *Page 16 
 {¶ 43} Because the trial court did not abuse its discretion by admitting the picture, we overrule appellant's second assignment of error.
 {¶ 44} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
FRENCH, P.J., concurs.
TYACK, J., dissents.
[1] Pursuant to appellant's Crim. R. 29 motion for acquittal at the end of the state's case, the trial court had already dismissed one of the rape counts.
[2] For example, A.M. wrote on June 18, 2005, that "I may have done the wrong thing. I think why did I have to say anything. Life was perfect. Mom was married * * *. I was the only one being hurt and I was getting to the point where I would forget about what would happen through the day."