[Cite as *Rex v. Univ. of Cincinnati College of Medicine*, 2013-Ohio-5110.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Douglas Rex, | : | |
| Plaintiff-Appellant, | : | |
| v. | : | No. 13AP-397 |
| | | (Ct. of Cl. No. 2009-04637) |
| University of Cincinnati | : | |
| College of Medicine, | | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on November 19, 2013

*Shea, Coffey & Hartmann, Joseph W. Shea, III, Shirley A. Coffey* and *Michelle A. Cheek*, for appellant.

*Mike DeWine*, Attorney General, and *Brian M. Kneafsey, Jr.*, for appellee.

APPEAL from the Court of Claims of Ohio

TYACK, J.

{¶ 1} Plaintiff-appellant, Douglas Rex, appeals the judgment of the Court of Claims of Ohio that found, in a medical malpractice case, that Rex failed to prove that his medical treatment by defendant-appellee, the University of Cincinnati College of Medicine, fell below the standard of care or that any negligence proximately caused his injury. For the following reasons, we agree with the Court of Claims and affirm the decision.

{¶ 2} Rex assigns three errors for our consideration:

1. The trial court erred by allowing inadmissible hearsay to be entered into evidence over objection on the pivotal issue of liability.

> 2. The trial court erred by allowing testimony that contradicted the witness's previous discovery responses when defendant had advance knowledge that the discovery response was incorrect and failed to disclose and correct the incorrect discovery response pursuant to Civ. R. 26(E)(2).
>
> 3. The trial court erred by deciding against the manifest weight of the evidence.

{¶ 3} This is a medical malpractice case arising from care Rex received while at the University of Cincinnati College of Medicine ("UCCM"). Rex was diagnosed with prostate cancer in spring 2008. Rex was referred to Robert Bracken, M.D., to explore treatment options. At that time, Rex's medical history included a trial fibrillation and two episodes involving a deep vein thrombosis for which he was prescribed Coumadin, an anticoagulant that slows the body's ability to stop bleeding. Surgery was decided as the best option and Rex met with Dr. Bracken on April 30, and May 7, 2008 to discuss risks and preparation for the surgery. (R. 78, at 325.) Dr. Bracken instructed Rex to stop taking Coumadin seven days prior to surgery, and he prescribed two daily doses of Lovenox at 1.45 cc's, the last to be taken the night before the morning surgery. (R. 78, at 338.) Lovenox is a short-term anticoagulant. Prescribing Lovenox as opposed to Coumadin as a temporary replacement leading up to a surgery is known as bridging therapy.

{¶ 4} On May 12, 2008, Dr. Bracken performed a robotic wide excision radical prostatectomy. Typically, this type of surgery only lasts for about two-to-three hours and the patient normally returns home the next day and can return to work in a little over one week. The surgery lasted for approximately seven hours and Rex unexpectedly lost a massive amount of blood, about 2.3 liters. (R. 78, at 533.) Rex was forced to recover in the Intensive Care Unit ("ICU") for over two weeks and spent additional time in the hospital and in a rehabilitation center. After the surgery, Rex began experiencing difficulty with his vision. The Cincinnati Eye Institute subsequently diagnosed Rex with Ischemic Optic Neuropathy.

{¶ 5} This matter was tried in the Court of Claims beginning August 13, 2012 and the magistrate rendered his decision on January 25, 2013. The trial court judge overruled Rex's objections and adopted the magistrate's decision finding that Rex failed to prove Dr.

Bracken's preoperative and surgical treatment fell below the standard of care or that any alleged negligence proximately caused Rex's injury to his eyes. Rex timely appealed the decision of the Court of Claims.

{¶ 6} Rex's first assignment of error avers that the trial court should not have allowed Dr. Bracken's testimony regarding his conversation with two internists regarding the bridging therapy and the prescribed dosage of Lovenox.

{¶ 7} As noted earlier, prior to surgery, Rex was taking Coumadin and having such an anticoagulant in his system during surgery increased the risk of an excessive amount of bleeding. Rex was taking Coumadin orally and the medication can take about four or five days to wear off. (R. 78, at 209.)

{¶ 8} Dr. Bracken prescribed Lovenox as a bridging therapy to reduce the risk of blood clots between the time when Rex would stop taking Coumadin and when the surgery was scheduled. Dr. Bracken prescribed 145 milligrams given twice a day for nine doses. (R. 78, at 336-37.) Dr. Bracken admits that he is not an expert on the proper dosage for this bridging therapy and therefore claims he sought out the opinions of two internal medicine doctors, Dr. Bradley Mathis and Dr. Greg Kennebeck. These internal medicine physicians, he testified, recommended the Lovenox dosage he prescribed. (R. 78, at 336.)

{¶ 9} The fact or content of the conversation with these two internists was not disclosed to appellant and his counsel until trial. Therefore, counsel had no opportunity to depose them or call them as witnesses. Dr. Bracken claims that, when preparing for trial, an associate reminded him of this conversation which Dr. Bracken had not remembered previously.

{¶ 10} Counsel for appellant claims the court erred in allowing Dr. Bracken to testify about this conversation, because counsel views the conversation as hearsay which goes to the pivotal issue of liability. UCCM argues that the trial court was within its discretion in allowing testimony concerning the conversation with the internal medicine physicians.

{¶ 11} "Since Evid.R. 802 expressly states that 'hearsay is not admissible,' a trial court's decision to admit hearsay is not governed by the test of abuse of discretion. Instead, errors relating to the trial court's admission of hearsay must be reviewed in light

of Evid.R. 103(A) and Crim.R. 52(A), which provide that such errors are harmless unless the record demonstrates that the errors affected a substantial right of the party." *State v. Sapp*, 10th Dist. No. 94APA10-1524 (Aug. 15, 1995) quoting *State v. Sorrels*, 71 Ohio App.3d 162, 165 (1st Dist.1991).

{¶ 12} We examine, therefore, the testimony of Dr. Bracken to determine if it was hearsay or proof of a verbal act. The testimony included the following:

> Q. And with reference to the prescription for Lovenox, how was it you determined the amount of the dosage?
>
> A. Well, during my deposition, I actually had forgotten how I had done that. But when I was preparing myself for this trial, I had wondered how I had come up with the dose of Lovenox that was prescribed because that's not something I have at the tip of my tongue.
>
> And I asked our male nurse, Neil Frankl, and he reminded me that both of us had gone down to the internal medicine office of doctors * * *.
>
> And so I usually go down there if I need some help. And I talk to whichever of the five or six internists who are there that I trust.
>
> On that particular day, it was Bradley Mathis and Greg Kennebeck. And after talking to them, I wrote this order.
>
> Q. And with reference to the calculation, how was it that the calculation was made as far as the dosage?
>
> A. Well, the dose is one milligram per kilogram twice a day, BID. Now, Mr. Rex was 320 pounds. There's 2.2 pounds per kilogram. And so if you divide 320 by 2.2, you come up with 145. So what we wanted him to have was a -- 145 milligrams given twice a day for nine doses. And this was at the recommendation of my two colleagues.
>
> MR. SHEA: Objection, hearsay, Your Honor.

(R. 78, at 335-37.) Appellant argues that this statement is hearsay, that Dr. Bracken is repeating the two internists' recommendation for the prescription for Lovenox. UCCM

argues the answer did not reveal what was said to him, only that Dr. Bracken had spoken to them about it. Neither side is literally correct.

{¶ 13} Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Dr. Bracken's statement is being offered to answer the question of how the dosage was calculated. There is no question in this instance as to what the dosage was or that the internists suggested some other dosage. This statement is evidence of a verbal act offered for the fact that the internists stated these calculations for a dosage not for the truth or falsity of the amount prescribed. The amount prescribed was not in debate at trial.

{¶ 14} Appellants may question whether the dosage was correct or whether the conversation took place at all, but Dr. Bracken's answer as to how he calculated the dosage prescribed is permissible. The statements are verbal acts because they are offered for the fact they were said, not for the truth of the matter asserted.

{¶ 15} UCCM makes the argument that Rex's counsel failed to timely object to Dr. Bracken's testimony about consulting the two internists. The trial testimony shows that an objection was clearly made at the point a suspected hearsay statement was actually made. (R. 78, at 337.) This argument is not well-taken.

{¶ 16} However, because the conversations were verbal acts, not hearsay, the first assignment of error is overruled.

{¶ 17} In the third assignment of error, Rex argues that the decision is not supported by the manifest weight of the evidence. Examining the whole record, we find that the trial court's decision is supported by competent and credible evidence. The trial court found Dr. Bracken's testimony credible and that any alleged negligence in prescribing Lovenox did not proximately cause Rex injury to his vision. While the evidence is susceptible to more than one construction, we cannot find in this case that the trial court's judgment is unsupported by credible evidence.

{¶ 18} Decisions supported by competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *Melvin v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 10AP-975, 2011-Ohio-3317, ¶ 34; *See C. E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279 (1978). A trial court's findings of fact are presumed correct, and "the weight to be given the evidence and

the credibility of the witnesses are primarily for the trier of fact to decide." *Eagle Land Title Agency, Inc. v. Affiliated Mtge. Co.*, 10th Dist. No. 95APG12-1617 (June 27, 1996), citing *State v. Thomas*, 70 Ohio St.2d 79 (1982). This presumption arises because the trial judge "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The trier of fact is free to believe or disbelieve all or any of the testimony. *State v. J.L.S.*, 10th Dist. No. 08AP-33, 2009-Ohio-1547. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Seasons Coal Co.* at 80, fn. 3 (citing 5 Ohio Jurisprudence 3d Appellate Review Section 603, at 191-92 (1978)).

{¶ 19} The magistrate found that the surgical bleeding did not cause damage to Rex's vision.

{¶ 20} "Furthermore, the court finds that plaintiffs failed to prove that the surgical bleeding proximately caused plaintiff's vision difficulties." (R. 75, Decision of the Magistrate, at 6.) The record demonstrated from Dr. Bracken's testimony that Rex's bleeding during surgery was not consistent with a patient who was over-anticoagulated:

> Q. And from all those numerous blood vessels that you transected during dropping the bladder, did you notice any abnormal bleeding from those blood vessels?
>
> A. No.
>
> Q. Did you notice it from any of the other cut sites as the surgery progressed?
>
> A. No. * * *
>
> None of those sites bled. The only site that bled was the area around the bladder neck.
>
> * * *
>
> Q. Have you treated other patients that have had robotic prostatectomy that have been anticoagulated prior to surgery?

A. All of our patients are anticoagulated prior to surgery. As I said earlier, we are concerned about deep vein thrombosis and pulmonary embolus.

Q. Have you ever had any patients that you felt were overanticoagulated as far as when you got in there, you noticed an excessive amount of --

A. I have not.

Q. Do you know what that would look like in a surgical site if a patient was overanticoagulated?

A. Well, I have been involved with other kinds of surgery where the person bled from everything that was cut. And, fortunately, that's an uncommon occurrence. * * * And in that setting, it was from every surface. It was kind of scary really. Everything that was cut, was bleeding.

So if that was the case in Mr. Rex, we would have seen bleeding from the trocar sites. He would have had bruising to his abdominal wall after surgery, if not during surgery. He would have bled from every single blood vessel that was cut, and that did not happen.

So I think that the kind of bleeding you're talking about, it fortunately is very unusual. I have not encountered it in patients that I have treated with robot prostatectomy and I did not encounter it in Mr. Rex.

(R. 78, Dr. Bracken testimony, at 350-53.)

{¶ 21} UCCM's expert witness, Dr. Abaza, also testified as to whether the surgical bleeding was consistent with overanticoagulation:

Q. With reference to a patient if you assume a patient is overanticoagulated, would you expect that patient to show signs of bleeding in a certain manner versus a patient who is not overanticoagulated?

A. Yeah. I've operated on patients who have been fully anticoagulated, meaning a therapeutic dose because it was unsafe for them to be on a prophylactic dose of anticoagulation.

And I've also operated on patients who have been overanticoagulated, meaning that they're super-therapeutic, a level that you wouldn't want them to be at in their daily life. You know, they're above what would be considered a therapeutic dose.

In those patients who are super-therapeutic, typically those are emergency operations where you don't really have much choice but to operate on them because you have to. And in those situations, typically what you see is just that all of the body surfaces upon disruption are oozy. In other words, it's not individual vessels that are bleeding, it's just that everything is kind of stained with blood because those little, tiny bleeders that stop on their own typically just kind of ooze. And so it's kind of everything you touch bleeds is typically how we describe it.

Q. And is your understanding of Mr. Rex's condition, is it like what you just described or not?

A. Again, I'm relying on the operative note and I didn't see that description in there.

Q. And would that lend -- you tend to believe that Mr. Rex's bleeding was or was not caused by overanticoagulation?

A. Again, you know, to my best ability to -- I would say that the bleeding that occurred during the surgery likely would have occurred anyway without any anticoagulation, because bleeding occurs during surgery even in the absence of all anticoagulation.

What I can't say is whether it may have lasted longer than it would have otherwise without the anticoagulation or not.

(R. 78, Dr. Abaza testimony, at 431-33.)

{¶ 22} On cross-examination, Dr. Abaza clarified that the recorded blood loss is not necessarily evidence of overanticoagulation:

Q. And I think that you told me as well if they're overanticoagulated, the problem is that it will cause more bleeding from surfaces that otherwise would stop sooner; is that fair?

A. Yeah.    Again, you know, in a patient who is super-therapeutic on anticoagulation, they just kind of ooze from everywhere.  You know, again, the description that you'll hear from surgeons is just everything I touched was bleeding.

Q.  Well, I mean[,] this patient began to bleed early and it just kept on going, didn't it?  If these times -- did you look at the times and how much the bleeding was? We started off with 150, then 200, and then 15 minutes, another 50.  I mean, we get down here at 6:30, in that 15 minutes between 12:00 and 12:15, he started to bleed.  He had 150 by 9:15 and that's about all you ever have in the whole surgery, isn't it?

A.  Which question do you want me to answer?

Q.  Well, this bleeding appears that once it started, it really didn't stop?

A.  I think you have to come and watch these surgeries with us a few times because it doesn't really work that way.

It may have been that during those 15 minutes, Dr. Bracken said to his assistant, hey, suck out his clot over here.  So all of a sudden now, the canister starts to fill out.  And then a half an hour goes by and the sucker is not used.  And then Dr. Bracken says, hey, look, get this spool over here.  And now it -- do you see what I'm saying?

Q.  Yes.

A.  So it's not literally that you can take those numbers that the anesthesiologist is just peering over at the canister and looking at every so often and thinking that that's actually what's happening inside the patient's body.

(R. 78, Dr. Abaza testimony, at 460-62.)

{¶ 23} The cross-examination of appellant's witness, Dr. Mathers, also touched on whether the blood loss was an indication of overanticoagulation:

Q. Dr. Bracken has testified, and will testify, that the blood was not oozing from the multiple cut surgical sites inside of Mr. Rex.  If you assume that to be true, that doesn't show -- the fact that it's not oozing from multiple sites doesn't show that he was necessarily overanticoagulated, does it?

A. In reviewing the anesthesia record with the surgery start time at approximately 8:00 in the morning, by 11:00 in the morning, they had already had 400 CCs blood loss, which is, I believe, twice what Dr. Abaza says his average is for an entire case. And that was after three hours of surgery. So that was a fair amount of blood seeping from somewhere or coming from somewhere in that three-hour period. And that's before we got into the heavy bleeding.

Q. But my question was: With Dr. Bracken testifying he noticed that the site of bleeding was only in one area behind the bladder and it wasn't oozing from any of the other cut sites, that would indicate, more likely than not, that it wasn't from overanticoagulation, where these other cut sites all would ooze blood?

A. That's his testimony.

Q. And you as a surgeon would have to agree with that; would you not? If a person's overanticoagulated, you would expect them to ooze blood from every cut site?

A. My answer previously was that within that first three hours, he had already lost 400 milliliters of blood. It was coming from somewhere. And by that time, he probably hadn't gotten to the posterior bladder neck.

(R. 78, Dr. Mathers testimony, at 260-61.)

{¶ 24} This evidence can support the interpretation that Rex was not overanticoagulated and we are bound to find this interpretation to support the trial court's interpretation of the facts. *See Seasons Coal Co.*

{¶ 25} The record does not really offer any contradicting evidence that Rex's bleeding was consistent with being overanticoagulated. Appellant anticipated that the trial court would find the excessive bleeding was a result of overanticoagulation. There is sufficient evidence that the trial court, as trier of fact, could find that the excessive surgical bleeding was a result of some particular site around the bladder neck that continued to bleed during surgery as Dr. Bracken testified.

{¶ 26} With Rex not exhibiting signs of overanticoagulation, it becomes a moot point whether Dr. Bracken met the appropriate standard of care in prescribing Lovenox.

Any possible failure in properly prescribing Lovenox cannot be said to have proximately caused any injury to Rex, whether that injury be his vision damage or his extended stay in the ICU. We find the trial court decision is supported by competent and credible evidence.

{¶ 27} The third assignment of error is overruled.

{¶ 28} The second assignment of error argues that the trial court improperly allowed Dr. Bracken to testify about consulting the two internists about the proper dosage of Lovenox because Dr. Bracken failed to correct his previous discovery response and did not follow Civ.R. 26(E)(2). As previously discussed, we are bound to interpret that the trial court found that the excessive bleeding was not a result of overanticoagulation. Therefore, Dr. Bracken's prescription of Lovenox did not proximately cause Rex's injury. Any possible violation of Civ.R. 26(E)(2) is therefore harmless. *See Gordon v. Ohio State Univ.*, 10th Dist. No. 10AP-1058, 2011-Ohio-5057, ¶ 88 ("even if the trial court erred in excluding Dr. Yates' testimony as to ODRC's alleged deviation from the standard of care, the trial court ultimately concluded that appellants failed to prove that any deviation in the standard of care provided by ODRC proximately caused McKinney's death. Thus, any error was harmless."). With a possible violation of Civ.R. 26(E)(2) rendered harmless by the trial court's determination of causation addressed earlier, the second assignment of error becomes moot.

{¶ 29} Rex's second assignment of error is rendered moot.

{¶ 30} Having overruled the first and third assignments of error and rendering moot the second assignment of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

CONNOR, J., concurs.
DORRIAN, J., concurs in judgment only.

DORRIAN, J., concurring in judgment only.

{¶ 31} I respectfully concur in judgment only as the evidence challenged by appellant does not address the trial court's finding of no proximate cause.